## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JAMES TAYLOR,**

       **Plaintiff,**

**vs.**                                                    **Civ. No. 11-369 ACT/KBM**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

       **Defendant.**

### MEMORANDUM OPINION AND ORDER

    **THIS MATTER** comes before the Court on the Motion to Reverse or Remand the

Administrative Decision and Memorandum Brief in Support of Plaintiff's Motion to Reverse or

Remand Administrative Decision ("Motion") of the Plaintiff James Taylor ("Plaintiff"), filed

December 22, 2011 [Docs. 19 and 20].  The Commissioner of Social Security ("Defendant")

filed a Response on February 27, 2012 [Doc. 21], and Plaintiff filed a Reply on March 6, 2012

[Doc. 22]. Having considered the Motion, the memoranda submitted by the parties, the

administrative record and the applicable law, the Court finds that the Motion is well-taken and

will be GRANTED.

### I.  PROCEDURAL RECORD

    On July 10, 2007, Plaintiff protectively filed applications for Social Security Disability

Insurance Benefits ("DIB") under Title  II of the Social Security Act, 42 U.S.C. §§ 401-433 and

Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. §§1381-1383f.  [Tr. 152,

158.]  Plaintiff was insured for benefits through December 31, 2011, and must show that he

became disabled on or before that date. [Tr. 11]  Plaintiff alleges a disability beginning May 5,

2007, due to severe neck pain, schizophrenia, depression, bipolar disorder, anxiety disorder, generalized anxiety, panic attacks and post-traumatic stress disorder. [Motion at 2.]  His applications were initially denied on December 6, 2007, and denied again at the reconsideration level on July 18, 2008. [Tr. 11, 76, 79 87, 92.]

The ALJ conducted a hearing on September 8, 2009. [Tr. 21-69.]  At the hearing, Plaintiff was represented by Attorney Barbara Jarvis.  On December 4, 2008, the ALJ issued an unfavorable decision.  In his report, the ALJ found that through the date last insured, Plaintiff had severe impairments of chronic neck pain, anxiety and depression. [Tr. 13.]  The ALJ concluded that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. [Tr. 13.] The ALJ determined that through the date last insured, Plaintiff had the residual functional capacity to perform light work as defined in CFR 404.1567(a). [Tr. 15.] The ALJ summarized as follows:

> [C]laimant has the RFC to perform light work, except that he can attend and concentrate for two hours at a time.  He is limited to simple tasks not performed in a fast paced production environment and should work with things rather than people. Further, the claimant is able to respond to changes in a routine work setting and should work in a setting where the work activity is isolated but not necessarily performed in an isolated work environment."

[Tr. 15.]  In considering the claimant's age, education, work experience, and residual functional capacity, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the claimant could have performed[.]"  [Tr. 18.]

On October 13, 2009, the Appeals Council issued its decision denying Plaintiff's request for review and upholding the final decision of the ALJ. [Tr. 8.] On May 2, 2011, the Plaintiff filed his Complaint for judicial review of the ALJ's decision. [Doc. No. 1.]

2

Plaintiff was born on September 4, 1966. [Tr. 152.]  The Plaintiff earned his GED in 1987 and has past work experience in construction –  installing drywall, framing and roofing -- and as a crane operator. [Motion at 2, Tr. 193.]  The claimant did not engage in substantial gainful activity during the relevant period of his alleged onset date of May 5, 2007, through his date last insured of December 31, 2011. [Tr. 13.]

## II.  STANDARD OF REVIEW

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act if her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).  In order to qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).   Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[1]

---

[1]     Step One requires the claimant to establish that she is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that she has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(C).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that she does not retain the residual functional capacity ("RFC") to perform her past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) to two inquiries: first, whether the decision was supported by substantial evidence; and second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted). Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.*, quoting *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its opinion for that of the Commissioner. *Hamlin*, 365 F.3d at 1214 (quotation omitted).

### III.  MEDICAL HISTORY

Plaintiff was 40 years old at the time he applied for DIB and SSI. [Tr. 152, 158.] In applying for benefits, Plaintiff stated he became disabled on May 5, 2007, due to "depression/anxiety/neck-rt shoulder" and that "I cannot be around people, I hear people talking about me, I become angry very quickly." [Tr. 192.] Plaintiff indicated that he stopped working on May 5, 2007, "due to the work conditions and my anger." [Id.]

Plaintiff has been homeless for a number of years and has received his medical care from Albuquerque Healthcare for the Homeless and First Nations Community Healthsource. The following represents Plaintiff's medical history prior to the date he was last insured (December 31, 2011).

---

exists in significant numbers in the national economy which the claimant, taking into account her age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1183 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

A.    <u>Neck Pain</u>

On November 21, 2007, Plaintiff was seen by Matias Vega, M.D., at Albuquerque

Healthcare for the Homeless Medical ("AHCH").  Plaintiff presented complaining of "chronic

neck pain and decreased ROM x 6 mos[.]" [Tr. 328.] Plaintiff reported no history of trauma, but

that he had been sleeping outside on a wooden pallette for the previous eight months. [Id.]

Dr. Vega noted decreased range of motion to the right and diagnosed Plaintiff with "neck

pain/cervicalgia."  [Id.] Dr. Vega indicated that the neck pain may be related to Plaintiff's

environment and sleeping conditions. [Tr. 330.] Dr. Vega prescribed Cyclobenzaprine[2] HCL 10

mg. Tabs #60 x 2 and Ibuprofen 400 mg. Tabs #60 x 2.

On December 6, 2007, Plaintiff again saw Dr. Vega at AHCH to request his medications

be refilled.  [Tr. 308.] Plaintiff reported he continued to have right sided neck pain and was

sleeping on his left side. [Id.] Plaintiff told Dr. Vega that he was seen at "UM ER" on September

12, 2007, where he was diagnosed with neck pain/sprain. [Id.] Dr. Vega observed that Plaintiff

held his head stiffly to the right, and upon exam noted tenderness with palpation and decreased

range of motion in Plaintiff's right shoulder due to his neck pain. [Id.] Dr. Vega refilled

Plaintiff's prescription of Cyclobenzaprine.  [Tr. 309.]

On April 11, 2008, Plaintiff presented to First Nations Community Healthsource and was

seen by Dr. Tracy Sanchez. [Tr. 294, 302.] Plaintiff complained of "neck pain, finger tips and

toes with numbness following standing." [Id.] Plaintiff told Dr. Sanchez that he had been

assaulted in March 2007 and had experienced constant, agonizing pain. [Id.] Upon exam,

---

[2]    Cyclobenzaprine, a muscle relaxant, is used with rest, physical therapy, and other measures to relax
muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries.
http://www.nlm.nih.gov/medlineplus/druginfor/meds/a682514.html.

Dr. Sanchez noted that Plaintiff had a full range of motion in his neck and upper extremity, that

Plaintiff's muscle strength was good, but that Plaintiff experienced neck pain when lifting

against resistance. [Id.] Plaintiff's social history indicated he smokes one pack of cigarettes a

day, uses alcohol daily, uses marijuana daily, and has no history of domestic violence. [Id.]

Dr. Sanchez referred Plaintiff to UNM Radiology to rule out a ruptured disc. [Tr. 301.] An

appointment was scheduled with UNM Radiology for May 20, 2008, at 2:30 p.m. [Id.]  The

record indicates that Plaintiff was aware of the appointment date and time. [Id.]

On May 6, 2008, Plaintiff returned to First Nations Community Healthsource to request a

prescription refill. [Tr. 303.] Dr. Sanchez prescribed Baclofen[3] 10 mg. #60 ½ tab TID and

Percocet 7.5/325 mg. #60 one by mouth BID as needed. [Id.]

**B.**   **Mental Impairments**

On June 30, 2008, Plaintiff presented to AHCH Clinical and was seen by Peggy Harter,

LPCC for a new clinical assessment. [Tr. 319-321.] LPCC Harter's clinical impression of

Plaintiff was as follows:

> Client is 41 year old male staying on the street.  Client has intense childhood abuse
> with beatings, verbal and emotional abuse.  Client has anxiety attacks,
> hypervigilance, fear of others, can't concentrate, gets overstimulated and then gets
> frustrated and angry (isn't sure about nightmares). [Client] has attempted suicide
> numerous times since childhood but no hospitalizations. [Client] is sad, no
> motivation, low energy, not sleeping, apathy and has been since adolescence.  Please
> evaluate for meds for PTSD and Major depression, moderate.  Referral to Tina.

[Tr. 321.]  LPCC Harter specifically indicated that Plaintiff's appearance, attitude and behavior

were inappropriate, he was overly anxious, his mood and affect were inappropriate, he appeared

to be depressed, and his thought process was inappropriate (thinking that someone is trying to

---

[3]   Baclofen acts on the spinal cord nerves and decreases the number and severity of muscle spasms
caused by multiple sclerosis or spinal cord diseases. It also relieves pain and improves muscle movement.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682530.html

hurt him, having trouble focusing, and hearing things that are not there). [Tr. 319.] LPCC

Harter's diagnostic impression was "Axis IV - Patient has a problem with primary support

group, social environment, education, occupational, economic, housing, access to health care.

Axis V - Patient's current GAF is 40."[4] [Tr. 320.] LPCC Harter noted Plaintiff's current

problems as "neck pain/cervicalgia" and added "Depression, Major, Recurrent, Moderate;

Anxiety Disorder;  and PTSD Chronic." [Tr. 321.]  LPCC Harter referred Plaintiff for an initial

psychiatric evaluation with "Tina." [Id.]

On June 30, 2008, Plaintiff also saw Physician Assistant Fauzia Malik at AHCH Medical.

[Tr. 322.] Plaintiff's chief complaint was requesting medication for post traumatic stress disorder

and depression. [Id.]  Plaintiff reported to PA Malik that he doesn't want to live anymore and

that he had stepped out in front of a bus "three days ago," but the bus stopped. [Tr.. 323.]

Plaintiff complained that he hears voices at night that talk to him and he sees shadows. [Id.]

PA Malik assessed Plaintiff with a psychotic disorder, anxiety, and anthralgia and prescribed

Risperdal,[5] Neurontin,[6] and Hydroxyzine Pamoate.[7]  She noted to "[s]chedule appt. to see Tina

Carlson, Psych Nurse Specialist." [Tr. 324.]

---

[4]     The GAF is a subjective determination based on a scale of 1-100 of "the clinician's judgment of the individual's overall level of functioning."  Diagnostic & Statistical Manual of Mental Disorders, 5th ed. (1994) ("DSM-IV"), p. 32.  Individuals with a GAF of 40 experience a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). *Id.*

[5]     Risperdal is an antipsychotic medication.  Risperdal is used to treat schizophrenia and symptoms of bipolar disorder (manic depression).  http://www.drugs.com/risperdal.html .

[6]     Neurontin (gabapentin) is an anti-epileptic medication, also called an anticonvulsant. It affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain. http://www.drugs.com/neurontin.html .

[7]     Vistaril a/k/a hydroxyzine-pamoate is used to treat anxiety, tension, and agitation caused by emotional stress. http://www.pdrhealth.com/drugs/hydroxyzine-pamoate.

On August 11, 2008, Plaintiff was seen again by PA Malik at AHCH Medical for a "follow up on congestion." [Tr. 316.]   Plaintiff reported to PA Malik that he was still hearing voices and seeing shadows. [Id.] PA Malik assessed Plaintiff with "[p]sychosis NOS and Anxiety d/o." [Tr. 317.]  PA Malik discontinued Risperdal and instead prescribed Seroquel[8] 100 mg. and Seroquel 25 mg. [Id.]  She also refilled Plaintiff's prescription for Hydroxyzine Pamoate for Plaintiff's anxiety and prescribed Albuterol for Plaintiff's congestion. [Id.]

On August 14, 2008, LPCC Harter completed a Questionnaire describing Plaintiff's medical diagnoses and functional limitations. [Tr. 334-338.]  LPCC Harter listed diagnoses of post-traumatic stress syndrome, psychotic disorder, major depression (moderate), and anxiety. [Tr. 334.]   She based her diagnoses on Plaintiff's signs and symptoms of sadness, tearfulness, apathy, lack of motivation, low energy, hopelessness, auditory hallucinations, paranoia, nightmares, flashbacks, disassociation, hypervigilance, short-term memory problems, panic attacks, and several suicide attempts. [Id.] She indicated that Plaintiff was on clinically prescribed psychiatric medications including Risperdal, Neurontin, Hydroxyzine-Pamoate and Seroquel, and that Plaintiff had been referred for counseling and ongoing psychiatric care with "Tina." [Id.]  LPCC Harter recommended that Plaintiff required treatment that included work on his coping skills for trauma, long-term therapy, support, and case management. [Id.]

LPCC Harter assessed that Plaintiff met the criteria under Part A for each of the following listed impairments:

1.   §12.03 - Schizophrenic, Paranoid, and Other Psychotic Disorders, which is "[c]haracterized by the onset of psychotic features with deterioration from a previous level of functioning." LPCC Harter indicated that Plaintiff suffers from delusions or hallucinations and emotional withdrawal and/or isolation.

---

[8]   Seroquel is an antipsychotic medication used to treat confusion, voices, agitation, and fearfulness associated with schizophrenia, bipolar disorder, depression, and other conditions. [Tr. 366.]

She also checked that Plaintiff manifests incoherence, loosening of associations, illogical thinking, or poverty or content of speech associated with flat affect.

2.      §12.04 - Affective Disorder, which is "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." LPCC Harter indicated that Plaintiff suffers from depressive syndrome characterized by anhedonia or loss of interest, appetite disturbance with change in weight, sleep disturbance, psychomotor agitation or retardation, decreased energy, feeling of guilt or worthlessness, difficulties in concentrating or thinking, thoughts of suicide, and hallucinations, delusions or paranoid thinking.

3.      §12.06 - Anxiety Disorder. LPCC Harter indicated that Plaintiff suffers from generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity; apprehensive expectation, and vigilance and scanning. In addition, she noted that Plaintiff has recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week. Finally, she checked that Plaintiff experiences recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.

LPCC Harter evaluated Plaintiff under Part B of these Listings as follows:

1.      "Restrictions in Activities of Daily Living" were "Marked";

2.      "Difficulties in Maintaining Social Functioning" were "Extreme";

3.      "Deficiencies in Concentration, Persistence or Pace Resulting in Failure to Complete Tasks in a Timely Manner (in working settings or elsewhere) were "Extreme"; and

4.      "Episodes of Deterioration or Decompensation in Work or Work Like Settings Which Cause the Individual to Withdraw from the Situation or to Exacerbate Signs and Symptoms" were "Four or More."

[Tr. at 338.] LPCC Harter indicated that Plaintiff's condition had been this severe since

2002 (sic) and she expected it to be severe long-term. [Id.]

LPCC Harter further assessed that Plaintiff's Mental Residual Functional Capacity was "Markedly Limited" in every category of understanding and memory,[9] social interaction,[10] and adaptation.[11]   She also assessed that Plaintiff's Mental Residual Functional Capacity was "Markedly Limited" in all but one category of sustained concentration and persistence.[12]  [Tr. at 339-40.] The only exception was Plaintiff's "ability to sustain a routine without special supervision," which LPCC Harter indicated was only "Moderately Limited." [Id.]

On October 28, 2008. Plaintiff presented to AHCH Medical and saw PA Malik requesting refills on his prescriptions. [Tr. 368-69.]   Plaintiff reported to PA Malik that he cannot hold down a job, that his anxiety had been bad, and that he had been unable to come to the clinic because that were so many people and he was worried about his bike being stolen. [Id.] Plaintiff told PA Malik he was living under a trailer. [Id.] He denied any suicidal thoughts or plans and stated that the voices "are (sic) bothering him anymore." [Tr. 369.] PA Malik refilled Plaintiff's prescriptions for Hydroxyzine Pamoate, Seroquel 25 mg., and Seroquel 100 mg.

---

[9]    This category includes  (1) the ability to remember locations and work-like procedures; (2) the ability to understand and remember very short and simple instructions; and (3) the ability to understand the remember detailed instructions.

[10]    This category includes (1) the ability to interact appropriately with the general public; (2) the ability to ask simple questions or request assistance;  (3) the ability to accept  instructions and respond appropriately to criticism from supervisors; (4) the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (5) the ability to maintain socially appropriate behavior to adhere to basic standards of neatness and cleanliness.

[11]    This category includes (1) the ability to respond appropriately changes in the work setting; (2) the ability to be aware of normal hazards and take appropriate precautions; (3) the ability to travel in unfamiliar places or use public transportation; and (4) the ability to set realistic goals or make plans independently of others.

[12]    This includes (1) the ability to carry out very short and simple instructions; (2) the ability to carry out detailed instructions; (3) the ability to maintain attention and concentration for expanded periods; (4) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) the ability to sustain an ordinary routine without special supervision; (6) the ability to work in coordination with or proximity to others without being distracted by them; (7) the ability to make simple work-related decisions; and (8) the ability to complete a normal work-day and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of length and rest periods.

On October 29, 2008, PA Malik completed a Questionnaire describing Plaintiff's medical diagnoses and functional limitations. [Tr. 342-349.] PA Malik listed diagnoses of post-traumatic stress syndrome, traumatic brain injury with mood disorder, asthma, and Hepatitis C. [Tr. 342.] PA Malik based her diagnoses on Plaintiff's signs and symptoms of auditory and visual hallucinations, agitation, nightmares, mood swings, insomnia, hypervigilance, decreased concentration, history of trauma, and lost consciousness. [Id.] PA Malik indicated she had provided medications, including Seroquel, Carbamazepine,[13] and Vistaril, and had referred Plaintiff for a psychiatric assessment and counseling. [Id.] PA Malik recommended that Plaintiff continue to see psychiatric provider Tina Carlson, a psychiatric nurse, and that he should also continue with medication management. [Id.]

PA Malik assessed that Plaintiff met the criteria under Part A for each of the following listed impairments:

1.      §12.03 - Schizophrenic, Paranoid, and Other Psychotic Disorders, which is "[c]haracterized by the onset of psychotic features with deterioration from a previous level of functioning." LPCC Harter indicated that Plaintiff suffers from delusions or hallucinations and emotional withdrawal and/or isolation. She also checked that Plaintiff manifests incoherence, loosening of associations, illogical thinking, or poverty or content of speech associated with flat affect.

2.      §12.06 - Anxiety Disorder. LPCC Harter indicated that Plaintiff suffers from generalized persistent anxiety accompanied by motor tension, apprehensive expectation, and vigilance and scanning. In addition, she noted that Plaintiff experiences recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.

---

[13]     Carbamazepine is used alone or in combination with other medications to control certain types of seizures in patients with epilepsy. Carbamazepine extended-release capsules (Equetro brand only) are used to treat episodes of mania (frenzied, abnormally excited or irritated mood) or mixed episodes (symptoms of mania and depression that happen at the same time) in patients with bipolar I disorder (manic-depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods). Carbamazepine is in a class of medications called anticonvulsants.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682237.html .

PA Malik evaluated Plaintiff under Part B of these Listings as follows:

1.      "Restrictions in Activities of Daily Living" were "Moderate";

2.      "Difficulties in Maintaining Social Functioning" were "Extreme";

3.      "Deficiencies in Concentration, Persistence or Pace Resulting in Failure to Complete Tasks in a Timely Manner (in working settings or elsewhere) were "Extreme"; and

4.      "Episodes of Deterioration or Decompensation in Work or Work Like Settings Which Cause the Individual to Withdraw from the Situation or to Exacerbate Signs and Symptoms" were "Three."

[Tr. at 345.] PA Malik indicated that Plaintiff's condition had been this severe for greater than one year and she expected his condition to be permanent. [Id.]

PA Malik further assessed that Plaintiff's Mental Residual Functional Capacity was either "Moderately Limited" or "Markedly Limited" in every category of understanding and memory[14] and social interaction.[15]  In the sustained concentration and persistence[16] and adaptation[17] categories, PA Malik indicated that Plaintiff's ability was either "Moderately Limited" or "Markedly Limited," except that she marked that Plaintiff's "ability to complete a normal work-day and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" and Plaintiff's "ability to respond appropriately to changes in the work setting" were "Not Ratable."  [Tr. at 346-47.]

---

[14]   Supra at n. 9.

[15]   Supra at n. 10.

[16]   Supra at n. 12.

[17]   Supra at n. 11.

On February 4, 2009, Plaintiff saw Tina Carlson, APRN, BC, at AHCH Psychiatry, who indicated she was screening Plaintiff as a new psychiatric patient. [Tr. 361.]  APRN Carlson noted that she saw Plaintiff on "10/8" and started him on Carbamazepine and Seroquel at that time.[18] [Id.] Plaintiff reported to APRN Carlson that he was much less angry overall and was sleeping better, but that he was still paranoid at night, having nightmares and night terrors, was depressed, continued to have auditory hallucinations, and remained nervous around people.  [Id.] Plaintiff stated he was sleeping under a truck at a warehouse and smoking marijuana to help him sleep. [Id.]   APRN Carlson prescribed Plaintiff Carbamazepine 200 mg., Seroquel 200 mg. and Wellbutrin SR[19] 150 mg.

On March 23, 2009, Plaintiff was seen at AHCH Psychiatry by Patricia Atherton for a psychiatric follow up. [Tr. 357-360.] Plaintiff reported at that visit that he continued to have trouble sleeping, to have night terrors, and to think that people are talking about him. [Tr. 358.] Plaintiff told Ms. Atherton that his mood was more stable on Carbamazepine, that he was not having any thoughts of self harm or hurting others, and denied having any audio or visual hallucinations. [Id.] Plaintiff stated he was "improved on meds because 'in the past I could never just sit here for an interview I would be all over the place.'"  [Id.]  Plaintiff indicated he was still sleeping under a truck and using marijuana to help him sleep. [Id.] Ms. Atherton refilled Plaintiff's prescriptions for Albuterol and Seroquel 25 mg.  [Tr. 359.]

---

[18]    The Transcript of the Administrative Record does not contain a record of this visit.  Plaintiff's Prescription Profile  from AHCH indicates that Tina Carlson first prescribed Carbamazepine on December 19, 2008, although it was not filled until February 4, 2009. [Tr. 353.] Seroquel was first prescribed for Plaintiff on August 11, 2008, by PA Malik.  It was refilled by Tina Carlson on February 4, 2009. [Id.]

[19]    Wellbutrin SR sustained-release tablets is an antidepressant.  http://www.drugs.com/cdi/wellbutrin-sr-sustained-release-tablets.html

On July 27, 2009, Plaintiff presented to AHCH Medical requesting refills for his prescriptions. [Tr. 349.] Plaintiff was seen by FNP-C Heidi Rogers. [Id.] Plaintiff told FNP-C Rogers that he had had three seizures "this month" and had been seen by EMS for "drop seizures." [Id.] Plaintiff also reported that he had been out of medication for awhile and was seeing Tina. [Id.]  FNP-C Rogers refilled Plaintiff's prescriptions for Albuterol, Seroquel 25 mg., Seroquel 200 mg., and Carbamazepine 200 mg.

### C.      Physical and Psychological Exams Scheduled by Commissioner

In filing for DIB and SSI, the Commissioner scheduled and rescheduled physical and psychological exams for Plaintiff.  Plaintiff failed to show up for these appointments. [Tr. 289, 291, 304, 312-313.] Plaintiff explained at his hearing that his first appointment was scheduled at 9:00 a.m. "somewhere out on Coors" and the bus didn't start running until 8:00 a.m.  By the time he got to Coors, it was already 8:45 a.m. He started walking, but realized it was too late to make the 9:00 appointment so he turned around.  He said the same thing happened with the second appointment. [Tr. 49.]

### IV. DISCUSSION

### A.      Step Two Findings

Plaintiff asserts that the ALJ committed reversible error by failing to find that *all* his impairments, including his schizophrenia, were severe at step two. [Motion at 5.]  Defendant contends Plaintiff failed to provide evidence establishing schizophrenia as a severe medically determinable impairment and that not finding that Plaintiff's severe impairment included schizophrenia would necessarily have been harmless. [Response at 4.]  Here, the ALJ found that Plaintiff has severe impairments of chronic neck pain, anxiety and depression. [Tr. 13.]

"At step two, the claimant must show that she has a medically severe impairment or combination of impairments." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quotation omitted).  The ALJ found Plaintiff has a medically severe impairment or combination of impairments, but did not include Plaintiff's schizophrenia when making that finding. That failure, by itself, does not constitute reversible error, *see Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987), because once the ALJ finds the claimant has a medically severe impairment or combination of impairments, he or she is required to "consider the limiting effects of *all* the claimant's impairments(s), even those that are not severe, in determining the claimant's residual functional capacity." 20 C.F.R. §§ 404.1545(e), 416.945(e) (emphasis added).

**B.     Step Three Findings**

Plaintiff asserts that the ALJ erred in finding that Plaintiff did not meet a listed impairment and that Plaintiff's mental impairment should have been found to meet the criteria for the Listing of Impairments at § 12.03 - Schizophrenic, Paranoid, and Other Psychotic Disorders; § 12.04 - Affective Disorders; and § 12.06 - Anxiety-Related Disorders. [Motion at 6.]  Plaintiff argues that Plaintiff's treating psychiatric care providers at AHCH completed questionnaires and indicated findings that fulfill the criteria of these Listings. [Id.]  The Defendant contends that the Plaintiff failed to provide evidence establishing that he had an impairment or combination of impairments that met or equaled a listing. [Response at 8.]  Specifically, Defendant argues that the Plaintiff "relies solely on the assessments from Ms. Harter and Ms. Malik as the basis for his assertion that the ALJ erred at step three" but that Social Security regulations make clear that as a counselor and physician's assistant "neither Ms. Harter nor Ms. Malik qualified as an acceptable medical sources, their opinions could not

15

qualify as medical opinions, and they could not establish the existence of a medically determinable impairment, much less one meeting or equaling a listing." [Response at 8-9.]  As such, their opinions were properly treated as "non-medical opinions" in accordance with SSR 06-03p.  [Response at 5.]   Defendant further argues that the "ALJ demonstrates in his decision that he properly evaluated the severity of Plaintiff's mental impairment . . . and found Plaintiff's anxiety and depression did not satisfy the 'paragraph B' or 'paragraph C' criteria for either of the applicable listings." [Response at 9-10.]

At step three, the ALJ determines whether any medically severe impairment, alone or in combination with the other impairments, meets or is equivalent to a number of listed impairments that are so severe as to preclude substantial gainful activity.  *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005).  At step three Plaintiff has the "burden to present evidence establishing [his] impairments meet or equal listed impairments."  *Fischer-Ross*, 431 F.3d at 733.  To satisfy this burden, Plaintiff must show that his mental impairment "meet[s] all of the specified medical criteria."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  The determination of whether Plaintiff's mental impairment meets or equals Listing 12.04 and 12.06 must be based solely on medical evidence.  *Bernal v. Bowen*, 851 F.2d 297, 300 (10th Cir. 1988).

With respect to Plaintiff's mental impairments, the ALJ evaluated Plaintiff's mental impairment under Listings 12.04 - Affective Disorder and 12.06 - Anxiety Disorder.  Pursuant to the B criteria under these listings, the claimant's mental impairment must result in at least two of the following to meet the required degree of functional loss that is incompatible with the ability to do any gainful activity:

1.      Marked restriction of activities of daily living;[20] or

2.      Marked difficulties in maintaining social functioning;[21] or

3.      Marked difficulties in maintaining concentration, persistence, or pace;[22] or

4.      Repeated episodes of decompensation, each of extended duration [.][23]

---

[20]   Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction. 20 C.F.R. Pt. 4040, subpt. P, App. 1, Mental Disorders, Assessment of Severity.

[21]   Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.   20 C.F.R. Pt. 4040, subpt. P, App. 1, Mental Disorders, Assessment of Severity.

[22]   Concentration, persistence or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.   20 C.F.R. Pt. 4040, subpt. P, App. 1, Mental Disorders, Assessment of Severity.

[23]   Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.   20 C.F.R. Pt. 4040, subpt. P, App. 1, Mental Disorders, Assessment of Severity.

20 C.F.R. Pt. 4040, subpt. P, App. 1, 12.04(b) and 12.06(b).

With respect to the B Criteria, the ALJ wrote:

> In activities of daily living, the claimant has moderate restriction. The evidence demonstrates that the claimant is currently homeless. However, he is able to perform daily activities such as bathing, dressing, and shopping independently and appropriately. He knows where to go for services and assistance and can make daily eating and sleeping arrangements. He receives food stamps and general assistance from the State of New Mexico and is able to manage his money.

> In social functioning, the claimant has moderate difficulties. The claimant does have some difficulty in this area. However, he is able to relate appropriately to his doctors and his representative. At the hearing he was polite and cooperative and answered questions articulately and appropriately.

> With regard to concentration, persistence or pace, the claimant has moderate difficulties. The evidence demonstrates that he has some difficulty maintaining sustained attention and concentration. However, it is not to a "marked" degree.

> As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been for extended duration. He has received treatment and counseling at Healthcare for the Homeless, but has never required inpatient psychiatric hospitalization.

The ALJ concluded that because claimant's "mental impairment does not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration," the paragraph B criteria were not satisfied. [Tr. 14.] The ALJ also, in conclusory fashion, found that Plaintiff's limitations did not meet the C criteria.[24] *Id.*

---

[24] The C criteria under Listing 12.04 is: "Medically documented history of a chronic affective disorder for at least 2 years duration that has caused more than minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.   Repeated episodes of decompensation, each of extended duration; or
2.   A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3.   Current history of 1 or more years' inability to function outside a highly supportive living arrangement,  with an indication of continued need for such an arrangement."

The C criteria under Listing 12.06 is: "Resulting in complete inability to function independently outside the area of one's home." 20 C.F.R. Pt. 404, Subpt. P, App.1, 12.06C.

18

The ALJ provided the following discussion regarding his assessment of Plaintiff's mental impairment and his reasons for rejecting the functional limitations assessed by LPCC Harter's and PA Malik's as evidenced in their respective questionnaires:

> Regarding the claimant's mental impairment, I realize that the claimant does have some mental difficulties.  However, I also note that the doctors at Healthcare for the Homeless have had difficulty stabilizing his condition because of poor compliance. . . .  Medical records document that he continues to experience symptoms of poor concentration, paranoia, social withdrawal, depressed mood and panic attacks. However, I note that these symptoms could be better controlled if the claimant was more compliant with medical treatment.
>
> . . .
>
> The questionnaire completed by Peggy Harter, LPCC also notes extreme functional restrictions, restrictions which are not supported by the objective signs and findings. Most importantly, Ms. Harter states that the claimant has been disabled since 2002 but then fails to explain why the claimant was able to perform substantial gainful work activity in 2005 and 2006.  In 2005 the claimant earned $13,598, and in 2006 he earned $13,771.  If he was as limited as Ms. Harter believes then how was it possible for the claimant to earn the aforementioned sums?  In the absence of such an explanation, Ms. Harter's medical source statement appears to be nothing more than an attempt to advocate for the claimant.
>
> The questionnaire dated October 29, 2008 was completed by Mr. [sic] Fauzia Malik, PA, a healthcare professional who saw the clamant only five times for one hour each time.  Such limited treatment is not sufficient to establish a longitudinal treatment history.  I also note that there is little, if anything, to support the extreme limitations noted in the questionnaire.

[Tr. 17.]

In discussing Plaintiff's mental impairment, the ALJ presents conflicting information. On the one hand, the ALJ acknowledges that the medical records support many of the diagnostic impressions of Plaintiff's mental healthcare providers.  On the other hand, the ALJ rejects the functional limitations those same mental healthcare providers assessed in relationship to their diagnostic impressions of Plaintiff.  When evaluating the evidence, the ALJ cannot pick and

choose the evidence upon which he relies simply because it supports his finding of non-disability. *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir.2004).

More troubling, however, is that in choosing to make his own assessment of Plaintiff's limitations and in rejecting LPCC Harter's and PA Malik's assessments of Plaintiff's extreme functional restrictions, the ALJ fails to explain what objective medical evidence he relies on to support his findings and rejections. The ALJ concludes that Plaintiff's mental symptoms could be better controlled if he were compliant with his medical treatments, yet fails to point to any evidence that Plaintiff's compliance would preclude disability or restore his ability to work. *Teter v. Heckler*, 775 F.2d 1104, 1107 (10th Cir. 1985). The ALJ broadly states that the extreme functional limitations noted by LPCC Harter are not fully supported by the medical evidence, yet points only to a date entered by LPCC Harter regarding how long the Plaintiff has been "disabled" and anchors the entirety of his explanation on that entry in rejecting her questionnaire. In rejecting PA Malik's assessment of Plaintiff's extreme functional restrictions, the ALJ concludes that because she saw Plaintiff "only five times for one hour each time" that it is not sufficient to establish a longitudinal treatment history, yet fails to explain why Plaintiff's seeing PA Malik five times is insufficient for her to obtain a longitudinal picture of Plaintiff's impairments, and how many times would be sufficient.[25]

The Court recognizes that the ALJ need not discuss every piece of evidence in the record, but the record must *demonstrate,* and not simply state, that the ALJ considered all of the evidence. Furthermore, in addition to discussing the evidence supporting his decision, the ALJ

---

[25] Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a *number of times* and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source. 20 C.F.R. § 404.1527(b)(2((i). (Emphasis added.)

also must also discuss "the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Here, in addition to not explaining what objective medical evidence supported his findings, the ALJ fails to explain why he accepts many of the diagnostic impressions of Plaintiff's physician's assistant and clinical counselor yet rejects their assessment of Plaintiff's functional limitations. As a result, the ALJ has made any subsequent review difficult, if not impossible. *See Luttrell v. Astrue*, 2011 WL 6739432, at *4 (10th Cir. Dec. 23, 2011) (unpublished) (noting that ALJ's discussion of the evidence is enough if it "allows a . . . subsequent reviewer to follow the [ALJ's] reasoning") (citation omitted). This is error.

While Defendant argues that disregarding LPCC Harter's and PA Malik's questionnaires is appropriate because the Social Security regulations make clear that they do not qualify as acceptable medical sources and "they could not establish the existence of a medically determinable impairment, much less one meeting or equaling a listing," Defendant's argument is somewhat misleading. In accordance with the regulations, "acceptable medical source" identifies only a named class of professionals. 20 C.F.R. §§ 404.1513, 416.913. Physician assistants and therapists are among another group of health-care providers called "other" medical sources, from whom the Commissioner will accept and use evidence showing the severity of a plaintiff's impairment(s) and how the impairment(s) affects an individual's ability to function. SSR 06-03p at *2. "Medical opinions" are defined as "statements from physicians and psychologist or other acceptable medical sources that reflect judgments about the nature and severity of [claimant's] impairment(s), including [claimant's] symptoms, diagnosis and prognosis, what [claimant] can still do despite impairment(s), and [claimant's] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). A "treating source" must be an

"acceptable medical source," *Id.* §§ 404.1502, 416.902, and a medical opinion from a "treating source" may be given controlling weight in certain circumstances.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Applying these regulations here, a physician's assistant and therapist are "other" medical sources and not "acceptable medical sources" or "treating sources."  Their opinions are not, strictly speaking, "medical opinions."  However, recognizing the reality that an increasing number of claimants have their medical care provided by health care providers who are not "acceptable medical sources," i.e.,  nurse-practitioners, physician's assistants, social workers, and therapists, the Commissioner promulgated SSR 06-3p.  In that ruling, the Commissioner noted:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physician and psychologists.  *Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.*

SSR 06-03p at *3, 2006 WL 2329939 (S.S.A.)(Aug. 9, 2006). (Emphasis added.)

SSR 06-3p explains that if a treating source opinion is not given controlling weight, opinions of other medical sources, such as physician assistants and therapists, will be evaluated using the same regulatory factors used for evaluating medical opinions.  SSR06-03 (citing 20 C.F.R. §§ 404.1527, 416.927).  Those factors include: (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion;

(4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion. The evaluation of an opinion from a "non-medical source" who has seen the individual in his or her professional capacity depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case. SSR 06-03p at *3.

In evaluating the evidence from other medical sources, SSR 06-03p states:

> An opinion from a "non-medical source" who has seen the claimant in his or her professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source. For example, this could occur if the "non-medical source" has seen the individual more often and has greater knowledge of the individual's functioning over time and if the "non-medical source's" opinion has better supporting evidence and is more consistent with the evidence as a whole.

SSR 06-03p at *6.

Finally, SSR 06-03p states how an ALJ should explain the consideration given to opinions from other medical sources as follows:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what an adjudicator must explain in the disability determination, *the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.*

SSR 06-03p at *6. (Emphasis added.)

Here, given Plaintiff's homeless status and receiving his medical care at AHCH, *all* of Plaintiff's mental healthcare providers are "other" medical sources and there is no treating

23

source opinion which as been given controlling weight.  Thus, the ALJ is required to evaluate the opinions of LPCC Harter and PA Malik, along with all of Plaintiff's other mental healthcare medical sources, using the same regulatory factors used for evaluating medical opinions.  In addition, the ALJ should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.  SSR 06-03p; 20 C.F.R. §§ 404.1527 and 416.927.  The ALJ failed to do so here.  This is error.

Finally, step three asks whether any medically severe impairment, alone or in combination with other impairments, meets or equals a listing.  20 C.F.R. §§ 404.1525 - 404.1526.  Here, the ALJ failed to consider Plaintiff's diagnosis of schizophrenia/psychotic disorder under Listing 12.03.  This is error.  *See Murdock v. Astrue*, 2012 WL 104878 (10th Cir., Jan. 13, 2012) (unpublished) (finding that ALJ erred by not discussing evidence or making findings to support a conclusion that certain impairment did not meet a listing.)  "A step three error, such as the one in this case, does not automatically require remand."  *Id.*  The Court must consider whether the ALJ's findings "conclusively preclude Claimant's qualification under the listings at step three" such that "no reasonable factfinder could conclude otherwise."  *Id.*, *quoting Fischer-Ross v. Barnhart*, 431 F.3d 729, 735 (10th Cir. 2005).   If "there are no findings that 'conclusively negate the possibility' that a claimant can meet a relevant listing, *see id.*, we must remand to the ALJ for further findings."  *Id.*, *see Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

Here, the ALJ made no findings that conclusively negate the possibility that Plaintiff could meet the pertinent requirements of Listing 12.03.  To the contrary, the record evidences

that (1) Plaintiff reported in his application that he hears people talking about him; (2) Plaintiff was diagnosed with psychotic disorder; (3) Plaintiff repeatedly complained of auditory and visual hallucinations to his mental healthcare providers;  (4) Plaintiff was prescribed medications to treat schizophrenia; and (5) Plaintiff testified at his hearing he experienced visual hallucinations at night and heard voices during the day.  [Tr. 47, 192, 316, 322, 323, 334, 335, 343, 349, 350, 354, 357, 359, 362, 363, 365, 366, 368.]

  In light of the above errors by the ALJ in his consideration of Plaintiff's mental impairment, the Court must remand for further findings.

  **C.**  **Remaining Claims of Error**

  The Court will not address Plaintiff's remaining claims of error.  *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining issues raised by appellant because they may be affected by the ALJ's treatment of this case on remand.").

<strong><u>CONCLUSION</u></strong>

  For the foregoing reasons, Plaintiff's Motion to Reverse or Remand the Administrative Decision [Doc. No. 19] is GRANTED.


_____
**ALAN C. TORGERSON**
**United States Magistrate Judge,**
**Presiding by Consent**